UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| EAGLE VIEW TECHNOLOGIES, INC., <br><br> Plaintiff, <br><br> v. <br><br> XACTWARE SOLUTIONS, INC., <br><br> Defendant. | CASE NO. C12-1913-RSM <br><br> ORDER ON DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT |

## I.  INTRODUCTION

This matter comes before the Court on Defendant's motion for partial summary judgment to dismiss Plaintiff's third cause of action for injunctive relief (Dkt. ## 117, 119).  For the reasons set forth below, Defendant's motion is DENIED.

## II.  BACKGROUND

Eagle View Technologies, Inc. ("Eagle View") provides aerial roof measurement services to insurance and contracting industries by applying its proprietary technology and techniques to aerial images, arriving at an accurate estimate of the area.  Xactware Solutions, Inc.

("Xactware") provides computer software to professionals in the insurance and construction industries involved in estimating building and repair costs. Many of Eagle View's customers use Xactware, so to work with these customers, Eagle View must have the ability to import and provide data through Xactware's network.

In November 2008, Eagle View and Xactware entered into an integration agreement ("Agreement") whereby Xactware granted Eagle View certain limited rights to import data from Eagle View's customers through Xactware's network. Among other things, Eagle View agreed to not enter into any agreements with Xactware's direct competitors as listed in the Agreement. Eagle View also agreed to issue Xactware one million warrants over a four year period to purchase shares of Eagle View stock according to the outlined schedule. On January 2011, the parties amended certain terms in which Eagle View was to pay eight percent of its Qualified Revenue on a monthly basis, calculated from the number of reports that are processed through Xactware's network. The parties had to provide written notice of termination 60 days prior to the Agreement's expiration, otherwise the contract would automatically renew for "like terms."

Following an unsuccessful attempt to negotiate further amendments, Eagle View filed a complaint for injunctive and declaratory relief, asking the Court to enjoin Xactware from terminating the Agreement on November 4, 2012. Dkt. # 1. On December 19, 2012, the Court granted in part Eagle View's preliminary injunction motion, preventing the parties from modifying or terminating the Agreement for 60 days. On appeal, the Ninth Circuit concluded that the preliminary injunction should remain in effect through the resolution of this matter to "safely avoid the risk of irreparable harm." Dkt. # 115. Now with the conclusion of discovery, Xactware argues that "specific performance" is not an available remedy. Dkt. # 119, p. 3. It seeks an order dismissing Eagle View's third claim for injunctive relief, which seeks to enjoin

Xactware from wrongfully or prematurely terminating the Agreement. Dkt. # 1 ¶¶ 47-49. Applying a specific performance theory, Xactware argues that relief is not available because: 1) the terms of the renewed contract are uncertain, 2) renewal will be futile given the parties' adverse relationship, and 3) Eagle View's unclean hands bar an equitable remedy. Eagle View disputes Xactware's characterization of the facts and argues that a determination on summary judgment is not appropriate.

Xactware from wrongfully or prematurely terminating the Agreement. Dkt. # 1 ¶¶ 47-49. Applying a specific performance theory, Xactware argues that relief is not available because: 1) the terms of the renewed contract are uncertain, 2) renewal will be futile given the parties' adverse relationship, and 3) Eagle View's unclean hands bar an equitable remedy. Eagle View disputes Xactware's characterization of the facts and argues that a determination on summary judgment is not appropriate.

Xactware from wrongfully or prematurely terminating the Agreement. Dkt. # 1 ¶¶ 47-49. Applying a specific performance theory, Xactware argues that relief is not available because: 1) the terms of the renewed contract are uncertain, 2) renewal will be futile given the parties' adverse relationship, and 3) Eagle View's unclean hands bar an equitable remedy. Eagle View disputes Xactware's characterization of the facts and argues that a determination on summary judgment is not appropriate.

### III.  DISCUSSION

**A.  Summary Judgment Standard**

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986). In ruling on summary judgment, a court does not weigh evidence to determine the truth of the matter, but "only determine[s] whether there is a genuine issue for trial." *Crane v. Conoco, Inc.*, 41 F.3d 547, 549 (9th Cir. 1994) (*citing Federal Deposit Ins. Corp. v. O'Melveny & Meyers*, 969 F.2d 744, 747 (9th Cir. 1992)). Material facts are those which might affect the outcome of the suit under governing law. *Anderson,* 477 U.S. at 248.

The moving party bears the initial burden of demonstrating the absence of any genuine issues of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The burden then shifts to the nonmoving party to make a "sufficient showing on an essential element of her case with respect to which she has the burden of proof." *Id*. The Court must draw all reasonable inferences in favor of the non-moving party. *See O'Melveny & Meyers*, 969 F.at 747, *rev'd on other grounds*, 512 U.S. 79 (1994). "The mere existence of a scintilla of evidence in support of

the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 251.

**B.  Choice of Law**

The Agreement is to be governed by and construed according to New York substantive law, in which neither party disputes. *See* Dkt. # 7, Ex. B.

**C.  Equitable Relief**

There are two main equitable remedies available on a contract action: specific performance and injunctive relief. While the two are similar, the difference is that specific performance orders a party to comply with the terms of the contract, whereas an injunction typically orders a party to refrain from a particular act. The distinction is relevant here, because Eagle View is not seeking a remedy that binds Xactware to perform specific conditions of the Agreement. As plainly stated in the complaint, it simply seeks to enjoin Xactware from terminating the Agreement "prematurely and without cause" on the basis that the Agreement automatically renewed. Dkt. # 1, p. 9. Thus, Xactware's motion to dismiss "specific performance" as a cause of action is not cognizable. *See Cho v. 401-403 57th St. Realty Corp.*, 300 A.D.2d 174, 175, 752 N.Y.S.2d 55 (1st Dep't 2002) (finding "specific performance is an equitable remedy for a breach of contract, rather than a separate cause of action."). However, since specific performance and injunctions are related equitable measures, the Court will interpret this as a motion to dismiss Eagle View's Third Cause of Action for injunctive relief. A permanent injunction is embodied in a final judgment and is typically considered *after* a trial on the merits. *Byrne Compressed Air Equip. Co. v. Sperdini*, 123 A.D.2d 368, 369, 506 N.Y.S.2d 593 (2d Dep't 1986) (emphasis added). Yet since contract and equitable principles may also limit the granting of such remedies, the Court will examine Xactware's arguments below.

1. Uncertainty of the Terms

Definiteness in material matters is necessary to a contract and material terms left for future negotiation are unenforceable. *Andor Group, Inc. v. Benninghoff*, 219 A.D.2d 573, 573, 631 N.Y.S.2d 79 (2d Dep't 1995). "A contract is ambiguous if the provisions in controversy are reasonably or fairly susceptible of different interpretations or may have two or more different meanings." *New York City Off-Track Betting Corp. v. Safe Factory Outlet, Inc.*, 28 A.D.3d 175, 177, 809 N.Y.S.2d 70 (1st Dep't 2006). Clear contractual language, however, "does not become ambiguous simply because the parties to the litigation argue different interpretations." *Riverside S. Planning Corp. v. CRP/Extell Riverside, L.P.*, 60 A.D.3d 61, 67, 869 N.Y.S.2d 511 (1st Dep't 2008), *affirmed* 13 N.Y.3d 398 (2009). Form should not prevail over substance and a sensible meaning of the words should be sought. *Atwater & Co. v. Panama R.R. Co.*, 246 N.Y. 519, 524, 159 N.E. 418 (1927). Whether a contract is ambiguous presents a question of law for resolution by the court. *Kass v. Kass*, 91 N.Y.2d 554, 566, 696 N.E.2d 174 (1998).

The parties dispute the meaning of "like terms" in Section 9 of the Agreement, which provides: "The term of this Agreement shall be for forty-eight (48) months from the final signature date of the two parties. Unless written notification is received sixty (60) days prior to the expiration of the current term, this Agreement shall automatically renew for *like terms*." Dkt. # 7, Ex. B (emphasis added). Eagle View's position is that "like terms" as plainly written speaks specifically to the renewal of duration, but not necessarily to other provisions in the Agreement, such as warrants, that have been fulfilled and require no further performance. Dkt. # 157 at 7. Otherwise, Eagle View believes that the Agreement renewed in its entirety including all remaining terms. *Id.* Xactware argues that Eagle View's position is inconsistent and cannot be reconciled if a "renewal" applies only to duration, but not all other essential provisions. Thus, the Agreement is necessarily uncertain and unenforceable. Dkt. # 119 at 5.

1    The plain meaning of "term" as defined in Section 9 is the 48 month duration of the
2 Agreement from the date of signing.  Thus, a renewal for "like terms" as written in this provision
3 directly correlates to the renewal of the 48 month duration.  There is no mention of other items
4 that are included in this "term," and as written, the language is not ambiguous.  Thus, the parties'
5 disagreement as to whether certain other provisions are included in this renewal does not render
6 the entire Agreement void as uncertain.  Xactware interprets Eagle View's position on the
7 renewal provision to mean that *only* the duration of the Agreement should be renewed, when in
8 fact Eagle View was specifically addressing the plain meaning of the renewal provision itself.[1]
9 Thus, Eagle View's standpoint on the issue does not necessarily render the entire Agreement
10 ambiguous or uncertain as Xactware contends.

11    2.  Futility

12    Mandatory injunctions or specific performance of contracts are typically subject to the
13 categorical rule that no decree would issue that requires ongoing supervision.  *Mine Workers v.*
14 *Bagwell*, 512 U.S. 821, 841-42, 114 S.Ct. 2552 (1994).  Once invoked, however, the scope of the
15 district court's equitable powers is broad as "breadth and flexibility are inherent in equitable
16 remedies."  *Hutto v. Finney*, 437 U.S. 678, 98 S.Ct. 2565 (1978) (quoting *Milliken v. Bradley*,
17 433 U.S. 267, 281, 97 S.Ct. 2749 (1977).  Xactware argues that Eagle View's ongoing
18 misconduct demonstrates the futility of equitable relief, resulting in lengthy, ongoing supervision
19 by the Court.  Dkt. # 119 at 5.  Xactware contends that the parties' relationship is irretrievably
20 broken with new disputes certain to arise in this fast-paced industry.  Dkt. # 173, p. 2.  To
21 support its contentions, Xactware points to a number of discovery documents as conclusive proof

---

[1] Xactware submits Eagle View's response to Xactware's request for admission on its position of regarding the "renew for like terms" provision.  Eagle View objected to the requests but admitted that "renew for like terms" refers to the durational term of the Agreement, which is not synonymous with "renew for like provisions."  Dkt. # 120, Ex. 1 at 5.

of Eagle View's ongoing breach of the Agreement.  It maintains:  1) Eagle View continues to breach the exclusivity provision by partnering with Xactware's direct competitors, particularly through a relationship with Symbility Solutions ("Symbility") and third party entities linked to Symbility; 2) Eagle View underpaid royalties by deducting an "Xactware fee;" and 3) Eagle View failed to give notice of an offer of sale from Pictometry International Corp. ("Pictometry"), as required by the Agreement.

The Agreement contains an exclusivity provision in Section 3, which provides that Eagle View's "services set forth herein are exclusive to Xactware, and [Eagle View] agrees not to enter into any agreements, written or otherwise, with Xactware's competitors, as listed in Exhibit C, that would enable or authorize such competitors to have access to integrated or linked [Eagle View] services. . . ."  Dkt. # 7, Ex. B.  Xactware alleges that Eagle View linked with direct competitors and other third parties, notably Symbility, and provides various deposition testimonies and discovery materials to show that Eagle View knowingly breached this provision and later attempted to cover up its violation.  Dkt. # 119 at 6-15.  Eagle View does not dispute providing services to Symbility, but distinguishes the type of "integrated or linked" services the Agreement prohibits and the standard services Eagle View actually provided according to its understanding of the exclusivity provision.  Dkt. # 157 at 12-13.  According to Eagle View, Symbility used these standard services to unilaterally create an integration system similar to Xactware's.  Eagle View executives shut down the services as soon as it was brought to their attention.  *Id.* at 14-18.  Similar arguments from both sides are made with respect to Eagle View's alleged underpayment of royalties and failure to give notice of a potential Pictometry merger.  *See* Dkt # 119 at 15-19, Dkt. # 157 at 19-27.  Essentially the parties have historically disagreed on the correct application of the Agreement's provisions.  While the Court is cognizant

of the parties' tenuous relationship throughout this litigation, mere disagreement over unresolved claims of breach is not conclusive of ongoing supervision by the Court. *See Anderson*, 477 U.S. at 249-50 (finding an issue cannot be genuine if it is unsupported by evidence or is created by evidence that is "merely colorable" but not "significantly probative.").

Further, Xactware has not moved for summary judgment on the merits of its breach claims, but rather uses its allegations of breach as conclusive evidence to preclude an equitable remedy for Eagle View. As previously discussed, Eagle View merely seeks to enjoin Xactware from terminating the Agreement on the basis of non-renewal. Dkt. # 157 at 27. The issue of termination for cause based on Eagle View's alleged breaches will be separately addressed on Xactware's breach claims and need not be resolved on this motion. In sum, there remain genuine issues of fact on whether breach of the Agreement occurred and whether the parties' alleged unwillingness to cooperate will be resolved with the resolution of those claims. At this stage, Xactware cannot use select evidence of the parties' disagreement to conclusively establish futility of enforcing the Agreement.

3. Unclean Hands

The doctrine of "unclean hands" refers to immoral, unconscionable conduct that is directly related to the subject matter in the litigation in which the party seeking to invoke was injured by the conduct. *Nat'l Distillers & Chem. Corp. v. Seyopp Corp.*, 17 N.Y.2d 12, 15-16, 214 N.E.2d 361 (1966). A defense of unclean hands, if sufficiently established, may preclude equitable relief. *See Flowers v. 73rd Townhouse, LLC*, 52 A.D.3d 104, 116, 857 N.Y.S.2d 146 (2008). To establish unclean hands, the burden is on the party asserting the defense to establish there was willful misconduct. *Horne v. Radiological Health Services, P.C.*, 83 Misc.2d 446, 456, 371 N.Y.S.2d 948 (N.Y.Sup. 1975) (finding ill will is insufficient to establish unclean

hands), *affirmed* 51 A.D.2d 544, 544 (2d Dep't 1976).  Xactware argues that Eagle View's alleged material breaches demonstrate unclean hands, which bar equitable relief.

As previously discussed, Xactware provides select evidence uncovered during discovery to demonstrate Eagle View's bad faith motives for the alleged breaches of the Agreement.  Eagle View disputes the characterization of the facts, arguing that Xactware relies on inadmissible hearsay and provides competing evidence to demonstrate the contrary.[2]  There is nothing conclusive here to bar an equitable remedy based on unclean hands.  Thus, Xactware's motion to dismiss Eagle View's Third Cause of Action for injunctive relief is DENIED.  *See Khayyam v. Diplacidi*, 167 A.D.2d 300, 301, 562 N.Y.S.2d 43 (1990) (affirming lower court's denial of dismissing a complaint alleging unclean hands on summary judgment where the facts were found to be unclear and contradictory and the court could not determine where the equities lay).

## IV.  CONCLUSION

Having considered Defendant's motion, the response and reply thereto, all of the attached declarations and exhibits, and the remainder of the record, the Court hereby finds and ORDERS:

(1) Defendant's motion for partial summary judgment (Dkt. # 117, 119) is DENIED.

Dated November 6, 2013.

RICARDO S. MARTINEZ
UNITED STATES DISTRICT JUDGE

---

[2] In Xactware's Reply, it argues that Eagle View's motion to strike unauthenticated emails should be denied. Dkt. # 173 at 12.  However, Eagle View did not formally move to strike the material it claims was inadmissible hearsay.  Thus, no materials referenced in the motions will be stricken at this time.